IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND
SOUTHERN DIVISION

| | | |
|---|---|---|
| DEBORAH S. LINZER | * | |
| | * | |
| Plaintiff, | * | |
| | * | |
| v. | * | Civil Action No.: AW-07-0597 |
| | * | |
| KATHLEEN SEBELIUS, | * | |
| Secretary, U.S. Department of Health | * | |
| And Human Services, | * | |
| | * | |
| Defendant. | * | |
| | * | |

**********************************************************************

**MEMORANDUM OPINION**

Plaintiff Deborah S. Linzer ("Plaintiff") brings this action against Defendant Kathleen Sebelius,[1] Secretary, United States Department of Health and Human Services ("Defendant"), pursuant to the Rehabilitation Act of 1973, 29 U.S.C. §§ 701, *et seq.* On February 8, 2008, the Court granted in part and denied in part Defendant's Motion to Dismiss. Plaintiff's claim for retaliation remains. Currently pending before this Court is Defendant's Motion for Summary Judgment. The Motion has been fully briefed and the matter is now ripe for review. No hearing deemed necessary. *See* Local Rule 105.6 (D.Md.2008). For the reasons set forth below, the Court will grant Defendant's Motion for Summary Judgment.

---

[1] On April 28, 2009, Kathleen Sebelius became the Secretary of the United States Department of Health and Human Services, and therefore is substituted for the former Secretary, Michael O. Leavitt, as the Defendant in this action. Fed. R. Civ. P. 25(d).

1

**Factual and Procedural Background**

The following facts are taken in the light most favorable to the non-movant.[2] Plaintiff is a former employee of the Department of Health and Humans Services. ("DHHS") Plaintiff joined the Genetic Services Branch ("GBS"), Division of Services for Children with Special Health Needs ("DSCSHN") as a Public Health Analyst (GS-685-13) in 1999. While employed at GBS, Plaintiff suffered from chronic fatigue syndrome. Her condition was officially diagnosed in June 2006, but Plaintiff exhibited some symptoms of the condition before June 2006. Her condition was intermittent and often caused Plaintiff to arrive at work at 9:30 a.m., but Plaintiff also arrived at work very early on other days. (Paper 22 Ex. 21 at 61.) At all times relevant to this case, Plaintiff's immediate supervisor was Dr. Michele Puryear, the Chief of GBS. Dr. Puryear's immediate supervisor, and Plaintiff's second level supervisor as of January 2006 was Bonnie Strickland, Acting Director of the DSCSHN. As a Public Health Analyst, Plaintiff's responsibilities included but were not limited to processing grant applications, drafting written guidance for current and prospective grantees for grants issued by the DHHS and assisting grantees with the operation of their grant programs. Up until the later part of 2005, Plaintiff received positive performance evaluations. She also received a cash award in October 2005, to reward her job performance. However, in late 2005 Plaintiff work performance changed. To perform her work, Plaintiff was required to interact with other Public Health Analysts in the GBS. At times Plaintiff's interaction with her co-workers was less than amicable. Plaintiff often "had disagreements [with her co-workers] about what direction" a grant program should taken and at times,

---

[2] The Court's citations to the exhibits attached to Paper 22 differ from Defendant's citations by three digits because Defendant's actual exhibits began at tab #4 in the hard copy of the record, whereas Defendant in numbering her exhibits began counting the first exhibit as exhibit #1.

Plaintiff "raised her voice in arguing her position with her colleagues and when addressing her supervisor. (Paper 22 Ex. 5 at 26, 27; *See also* Paper 22 Ex. 12.) Upon at least one occasion, Plaintiff used profanity and shouted at her colleague, Ms. Marie Mann, during a discussion about a particular grant program. (Paper 26 Ex. 16.) Feeling threatened and intimidated, Ms. Mann left the meeting, but Plaintiff followed her out of the meeting and continued to shout at Ms. Mann and use profanity.

In December 2005, Plaintiff disrupted a meeting led by Dr. Puryear with several GSB staff and various DHHS grantee representatives. During the meeting Plaintiff disrupted the meeting by carrying on her own conversation with another GSB staff member. Dr. Puryear asked Plaintiff and the other GBS staff member to step into the hallway. She then verbally reprimanded both of them for being disruptive. At the end of December 2005, Plaintiff requested 16 hours of religious leave to observe Chanukah. Dr. Puryear denied Plaintiff's request. Plaintiff complained to Michael Mucci, Executive Officer of the Health Resources Services Administration. Subsequently, Dr. Puryear approved Plaintiff's request and informed Plaintiff that in accordance with Federal Government regulations, she would need to make up the time. Dr. Puryear required Plaintiff to pay back the time during the Agency's established work hours of between 6:00 a.m. and 6:00 p.m., and suggested that Plaintiff arrive for work an hour earlier for several days to make up the time. In response, Plaintiff told Dr. Puryear that she had difficulty waking up in the morning and that starting her workday prior to 9:30 a.m. to make up the time would be difficult. Plaintiff requested that she be allowed to work late at night and on the weekends to make up the time. Dr. Puryear denied Plaintiff's request stating that "the Branch functions better when we have consistent times for interaction" and asked her to arrive

3

at work by 8:30 a.m. as often as possible to make up the time. But Dr. Puryear also told Plaintiff that she would "allow [her to work] some later work days." (Paper 22 Ex. 18.)

On December 16, 2005, Plaintiff formally requested a reasonable accommodation. Plaintiff wrote Dr. Puryear a Memorandum and requested a schedule "allowing for the adjustment of [her] arrival and departure times." (*Id*. Ex. 19.) Plaintiff requested that she be permitted to arrive at 10:30 a.m. and work beyond 6:00 p.m., when necessary because of her medical condition. *Id*. According to Dr. Puryear, this was the first she heard of Plaintiff's medical condition.

On January 5, 2006 Plaintiff wrote a letter to Bonnie Strickland and complained about having to make up the religious leave during DHHS's established work hours. (*Id.* Ex. 20.) Plaintiff stated she considered this requirement retaliatory, and stated that she intended to formally apply for a medical accommodation.

On January 29, 2006, Ms. Strickland met with Dr. Puryear and informed her that she had received a written complaint from Plaintiff about harassment, discrimination and her comp time requirements. (Paper 22 Ex. 24.) On or before February 8, 2006, Plaintiff hired an attorney and made informal contact with the EEO. (*Id.* Ex. 55.) In her informal complaint, Plaintiff cited a "failure to provide medical accommodation," and a "failure to provide religious accommodation" as the basis of her complaint. That same day, Plaintiff requested documents to apply for advance sick leave under the Family Medical Leave Act ("FMLA"). Plaintiff requested 87 hours of advanced sick leave. Dr. Puryear approved Plaintiff for 80 hours of advance sick leave. On February 15, 2006, Dr. Puryear requested documentation from the Plaintiff of the doctor's appointments for which Plaintiff would use the sick

leave. (*Id.* Ex. 25.) On February 21, 2006, Plaintiff informed Dr. Puryear that she changed her mind and was not seeking a medical accommodation, but instead she intended to pursue a reasonable accommodation through the Agency's EEO office. (*Id.* Ex. 27.) In her request to the Agency's EEO office, Plaintiff requested "a self-paced workload with flexible hours," and an "alteration of supervisory methods." (*Id.* Ex. 28.)

On February 15 or 16, 2006, upon the advice of Human Resources officials, Dr. Puryear set up a meeting for February 17, 2006, to discuss Plaintiff's behavior problems to date. Dr. Puryear also intended to discuss some program related issues during the meeting. On February 17, 2006, they met in Dr. Puryear's office. When Dr. Puryear began to address Plaintiff's behavioral issues, Plaintiff became visibly angry and walked out of Dr. Puryear's office to her own office. Dr. Puryear followed Plaintiff and continued to transmit the information she wished to transmit. Plaintiff then left her office and went down to the EEO office. Plaintiff then proceeded to building security and filed a claim. Subsequently, an EEO counselor attempted to mediate over the issues raised by Plaintiff, but those efforts were unsuccessful and on May 3, 2006, Plaintiff filed a formal complaint of discrimination on the basis of a physical handicap. (*Id.* Ex. 31.) In the formal complaint, Plaintiff complained that the DHHS failed to provide her a religious accommodation and a medical accommodation. Because communications broke down on February 17, 2006, Dr. Puryear sought guidance from Human Resources on how to proceed, and as a result, Dr. Puryear drafted a Memorandum of Counseling detailing seven specific instances, dating back to the summer of 2005, of Plaintiff's "unacceptable conduct and failure to follow instructions." (*Id.* Ex. 10.) In the Memorandum of Counseling, Dr. Puryear warned Plaintiff that "corrective action" may be taken if Plaintiff's

5

"misconduct" continued. (*Id*.) Dr. Puryear concluded the Memorandum by stating that the document would not be placed in Plaintiff's personnel folder and was not "grievable." (*Id*.) Plaintiff did not sign the document. (*Id*.)

On March 3, 2006, Plaintiff completed the required forms for her request under the FMLA. (*Id.* Ex. 32.) The Agency forwarded the documents to the Federal Occupational Health ("FOH") physician. (*Id.* Ex. 33.) On March 13, 2006, the FOH determined that Plaintiff had a serious health condition that warranted approval of leave under the FMLA. (*Id*. Ex. 34.) In particular, in a letter dated April 17, 2006, the physician recommended that Plaintiff "work at home on a part time basis, such as Tuesday and Thursday, while working in her official work site on the remaining days," with a "maximum of flexibility around the office's core hours. (*Id*. Ex. 35.) On April 28, 2006, the Agency's disability program manager informed Plaintiff's supervisors of the FOH's recommendation. (*Id*. Ex. 36.)  Subsequently, Dr. Puryear and Ms. Strickland approved the FOH's recommendation and permitted Plaintiff to work from home on Tuesdays and Thursdays. (*Id*. Ex. 39.)

In April 2006, Plaintiff became the Director of the National Hemophilia and Thalassemia programs. The impetus for the change began as far back as April 2005, when Dr. Peter Van Dyck, the Director of the Bureau of Maternal and Child Health, decided that that Agency should shift resources and focus. As a result, in April 2006, Plaintiff's grant programs came to an end, and Dr. Puryear assigned Plaintiff to the National Hemophilia and Thalassemia program. Plaintiff was informed of the decision on April 13, 2006. (Paper 22 Ex. 40.)

On June 21, 2006, Plaintiff amended her EEO Complaint to include a claim for retaliation. (Paper 22 Ex. 41.) On that same day, Plaintiff e-mailed Dr. Van Dyck to make him "aware of . . . developments and to be clear

6

about what [she needed] to be effectively accommodated under the law." (*Id.*) Among other things, Plaintiff requested a "self-paced workload with flexible hours." (*Id.*) On June 27, 2006, Plaintiff's physician wrote a note stating that Plaintiff would be out on sick leave for a yet undetermined length of time. (*Id.* Ex. 43.) On July 11, 2006, Plaintiff's physician sent a letter to the agency diagnosing Plaintiff's medical condition and stating that she was "unable to work." (*Id.* Ex. 44.) On July 19, 2006 Plaintiff's attorney informed Dr. Puryear that Plaintiff intended to file for disability retirement, "due to her medical inability to perform useful and efficient federal service." (*Id.* Ex. 46) On October 25, 2006, Dr. Puryear proposed the removal of Plaintiff from federal service based on her "medical inability to perform the essential duties of [her] officially assigned position." (*Id.* Ex. 47.) Ms. Strickland decided to remove Plaintiff from her position as a Public Health Analyst, effective November 26, 2006. (*Id.* Ex. 48)

On March 8, 2007, Plaintiff filed the instant action with this Court. Defendant moved to dismiss the action on June 5, 2007. (*See* Paper 4.) After a hearing on the Motion to Dismiss, the Court granted in part and denied in part the motion. The Court granted the motion with respect to Plaintiff's claims for wrongful termination and failure to reasonably accommodate, and the Court denied the motion with respect to Plaintiff's claims of retaliation. (*See* Paper 12.)

The parties have concluded discovery, and the Defendant now moves for summary judgment.

**Standard of Review**

Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to

7

judgment as a matter of law." Fed. R. Civ. P. 56(c); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986). The court must "draw all justifiable inferences in favor of the nonmoving party, including questions of credibility and of the weight to be accorded to particular evidence." *Masson v. New Yorker Magazine, Inc.*, 501 U.S. 496, 520 (1991) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). When parties file cross motions for summary judgment, the court must view each motion in a light most favorable to the non-movant. *Mellen v. Bunting*, 327 F.3d 355, 363 (4th Cir. 2003). To defeat a motion for summary judgment, the nonmoving party must come forward with affidavits or other similar evidence to show that a genuine issue of material fact exists. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986). While the evidence of the nonmoving party is to be believed and all justifiable inferences drawn in his or her favor, a party cannot create a genuine dispute of material fact through mere speculation or compilation of inferences. *See Deans v. CSX Transp., Inc.*, 152 F.3d 326, 330-31 (4th Cir. 1998). Additionally, hearsay statements or conclusory statements with no evidentiary basis cannot support or defeat a motion for summary judgment. *See Greensboro Prof'l Fire Fighters Ass'n, Local 3157 v. City of Greensboro*, 64 F.3d 962, 967 (4th Cir. 1995).

**Analysis**

Plaintiff's claim for retaliation is premised upon the following four events that took place during 2006 after she filed a complaint with the EEOC: (1) a meeting that took place at the request of Dr. Puryear in Dr. Puryear's office on February 17, 2006; (2) a Memorandum of Counseling issued to her by Dr. Puryear of March 21, 2006; (3) a decision to make her the Director of the National Hemophilia and Thalassemia Programs in April 2006; and (4) the

Agency's decision, in June 2006, to grant her request to work from home to accommodate her medical condition.

To establish a claim for retaliation, Plaintiff must show: (1) she engaged in protected activity; (2) Defendant acted adversely against her;"[3] and (3) there is a causal connection between the protected activity and the asserted adverse action. *See Holland v. Washington Homes, Inc.*, 487 F.3d 208, 218 (4th Cir. 2007). If Plaintiff establishes a prima facie case of retaliation, the burden then shifts to Defendant to offer a legitimate, non-discriminatory basis for the adverse employment action. *King v. Rumsfeld*, 328 F.3d 145, 151 (4th Cir. 2003)(citing *Williams v. Cerberonics, Inc.*, 871 F.2d 452, 457 (4th Cir.1989)).  If the Defendant sustains her burden, the burden then shifts back to Plaintiff to establish that the reasons advanced by Defendant are a pretext for unlawful discrimination. *Id*.

Here, it is undisputed that Plaintiff engaged in protected activity when she filed a complaint with the EEO on February 10, 2006.  (Paper 26 at 3.)   Prior to *Burlington Northern & Santa Fe Railway Co. v. White*, an employee claiming retaliation needed to demonstrate a change in the "terms and conditions, or benefits" of their employment in order to satisfy the second element of the prima facie case.  548 U.S. 53 (2006); *see e.g. Von Guten v. Maryland*, 243 F.3d 858, 866 (4th Cir. 2001).  In *Burlington*, however, the Supreme Court pronounced that in order to satisfy the "adverse

---

[3] Defendant avers that some ambiguity in the law exists with respect to this prong in the context of claims brought by federal employees.  Defendant references decisions from two District Courts in this Circuit that have declined to follow the Supreme Court 's "reasonable employee" standard in advanced in *Burlington Northern & Santa Fe Railway Co. v. White* for claims involving a federal employee.  548 U.S. 53 (2006).  In *Ziske v. Mineta*, the Fourth Circuit expressly declined to address whether the standard applies to federal employees.  547 F.3d 220, 229 (4th Cir. 2008)(noting that "there is disagreement about whether the Supreme Court's decision regarding the scope of the adverse action requirement in [*Burlington*] applies to federal employees," but finding that Plaintiffs claim of retaliation failed regardless of the standard applied.)  The present case is similar to that of *Ziskie* because the Plaintiffs allegations fails create any genuine dispute of material fact sufficient to survive a motion for summary judgment regardless of the standard applied.

action" element of the prima facie case, an employee "must show that a reasonable employee would have found the challenged action materially adverse." 548 U.S. at 68. Defendant argues that under either standard, Plaintiff's claims fail to sustain her burden of establishing a prima facie case, nor does she advance any evidence that would suggest that Defendant's action were pretextual. The Court will address each alleged incident of retaliation in turn.

 A. **February 17, 2006 Meeting**

Plaintiff claims that Defendant took action that was "materially adverse" to her when Dr. Puryear confronted Plaintiff with charges of insubordination and poor job performance. (Paper 26 at 14) Plaintiff argues that the requisite causal connection is satisfied because the meeting took place the day after Plaintiff informed Dr. Puryear that she had a meeting with an EEO counselor. (*Id*. at 15.) The undisputed facts concerning that meeting are as follows: On February 15 or 16, 2006, Dr. Puryear scheduled a meeting with Plaintiff to discuss a project that Plaintiff was working on. Prior to the meeting, Dr. Puryear meet with an Agency Human Resources official. Upon the official's suggestion, Dr. Puryear decided to address some of the concerns she had regarding Plaintiff's work performance and behavior. (Paper 22 Ex. 6 at 61.) The meeting took place at approximately 4:00 p.m. on February 17, 2006, in Dr. Puryear's office. As the meeting proceeded, Dr. Puryear raised Plaintiff's behavioral and performance issues, and the communication between Dr. Puryear and Plaintiff broke down. Plaintiff abruptly left the meeting, went to building security and complained that she felt threatened. (Paper 26 at 3.) Defendant argues that under the *Von Guten* standard or the *Burlington* standard, Plaintiff has failed to satisfy the second prong of a prima facie case. Applying *Von Guten*, meeting

with one's supervisor "on one occasion during normal business hours is a normal everyday workplace occurrence" did not cause any change in the terms or conditions of Plaintiff's employment. *See Green v. Fairfax County Sch. Bd.*, 832 F. Supp. 1032, 1040 (E.D. Va. 1993)(holding that "routine day-to-day work occurrences" which do not adversely [plaintiff's] job position or compensation" are not adverse employment actions.)  Furthermore, Defendant argues that "no reasonable employee would consider having to meet with one's supervisor materially adverse" because "it is a requirement of being an employee working under a supervisor." (Paper 22 at 23.)  Defendant also argues that Plaintiff admitted that Dr. Puryear never raised her voice or physically threatened Plaintiff in any way, nor did Dr. Puryear mention Plaintiff's EEO complaint during the meeting.  (Paper 22 Ex. 2 at 75) Finally, Defendant argues that the true reason Plaintiff claims the meeting was retaliatory is because Plaintiff believed that any discussions regarding her work behavior were "off the table," and "hands off."  (Paper 22 Ex. 2 at 130.)  Defendant argues that the case law is clear that the filing of an EEO complaint does not insulate a complaining employee from the consequences of insubordination or poor performance. *See Ziskie*, 547 F.3d at 229.

The Court agrees and finds that Plaintiff has failed to establish that a reasonable employee would consider the February 17, 2006, meeting "materially adverse," or that this constituted a change in the terms or conditions of her employment. *See Burlington,* 548 U.S. at 55; *Von Guten*, 243 F.3d at 866. The parties have had the opportunity to conduct discovery and Defendant cites numerous statements made in the depositions of her own witnesses and that of Plaintiff, to support the assertion that the February 17, 2006, meeting was not retaliatory. (*See* Paper 22 at 24-25) Plaintiff's response simply states that the February 17, 2006, meeting was materially

adverse, and states nothing more. (Paper 26 at 14.)  While the Court must view the evidence in the light most favorable to the non-movant, such conclusory statements cannot stand in the face of a Motion for Summary Judgment. *See Greensboro Prof'l Fire Fighters* Ass'n, 64 F.3d at 967. Because the second element of retaliation is not satisfied, Plaintiff's retaliation claim based on the February 17, 2006, meeting fails.  Even had Plaintiff satisfied the second element, this portion of her retaliation claim would still fail because Plaintiff does not advance sufficient evidence to support a finding of a causal connection between the February 17, 2006, meeting and her protected activity.  Plaintiff merely states that there is a causal connection because the meeting took place the day after Plaintiff told Dr. Puryear of her meeting with an EEO counselor and concludes that "there is direct evidence of Dr. Puryear's intent to retaliate against [Plaintiff.]" (Paper 26 at 15.)  The Court is not persuaded.  Citing Plaintiff's deposition, Defendant avers that Dr. Puryear set up the meeting "before she had knowledge of the [Plaintiff's] EEO activity."  (Paper 22 at 25.) (citing Paper 22 Ex. 2 at 67.)  Defendant then cites *Gibson v. Old Town Trolley Tours* for the proposition that a supervisor's knowledge of an EEO complaint is "necessary" to prove a causal connect to support a retaliation claim. 160 F.3d 177, 182 (4th Cir. 1998).  Plaintiff does not refute Defendant's claim regarding Dr. Puryear's knowledge, nor does she take issue with Defendant's statement of the law.  Thus the Court must find that Plaintiff's claim for retaliation with regard to the February 16, 2006, meeting must fail.

**B. March 21, 2006 Memorandum of Counseling**

Plaintiff points to the memorandum of counseling presented to her by Dr. Puryear and Dr. Strickland as the second basis for her claim of retaliation.  Aside from simply stating that the event took place, Plaintiff

12

offers no additional evidence to support her claim that this action was retaliatory. Defendant does not dispute that Dr. Puryear authored the Memorandum of Counseling, but she argues that it was done upon the advice of Human Resources officials. (Paper 22 Ex. 4 at 8.) Defendant also argues that the memorandum of counseling was not an "adverse action" because under *Burlington* "letters of reprimand" are not materially adverse employment actions and moreover Plaintiff did not "suffer any loss in pay, benefits, [nor were any of the] other terms and conditions of [her] employment" changed. (Paper 22 at 29.) Finally, and most significantly, Defendant claims that the memorandum of counseling was not a materially adverse action because Plaintiff amended her EEO complaint in June 2006, (Paper 22 Ex.41.) and ordinarily, a materially adverse action is an action that "would prevent a reasonable person from making a charge of discrimination." (Paper 22 at 30)(citing *Somoza v. Univ. of Denver*, 513 F.3D. 1206, 1214 (10th Cir. 2008).) Plaintiff does not rebut Defendant's argument, nor does she take issue with Defendant's statement of the law or cite any case for a contrary proposition. Thus the Court must find that Plaintiff's claim for retaliation with regard to the March 21, 2006 memorandum of counseling must also fail.

### C. April 2006 Decision to Make Plaintiff Director of the National Hemophilia and Thalassemia Programs

In April 2006, Plaintiff became the Director of the National Hemophilia and Thalassemia programs. (Paper 26 at 3.) Plaintiff claims this was retaliatory because she "had no experience in either area." (*Id*.) Defendant avers that the decision to make Plaintiff the Director of the National Hemophilia and Thalassemia programs was due to a shift in the Agency's resources and focus back in 2005, at the direction of Dr. Peter van Dyck, the Director of the Bureau of Maternal and Child Health. (Paper 22 at 15.) Dr. van Dyck's shift of focus meant that the grants that Plaintiff managed, would

13

not be renewed after March 2006.  (*See* Paper 22 Ex. 4 at 6-7.)  Defendant also maintains that this decision was supported by Ms. Strickland, (*See* Paper 22 Ex. 5 at 5-6.) and was done in an effort to "protect Plaintiff's grade." (Paper 22 Ex. 8 at 2.)  For these reasons, Defendant argues that Plaintiff's claim must fail because although Plaintiff's duties changed, there was no impact on her salary, benefits or any of the other terms and conditions of her employment, and under the *Burlington* standard, a mere change in duties is insufficient to constitute an "adverse action."  *See James v. Booz-Allen & Hamilton, Inc.*, 368 F.3d 371, 376 (4th Cir. 2004)(holding that "absent any decrease in compensation, job title, level of responsibility, or opportunity for promotion, reassignment to a new position commensurate with one's salary level does not constitute an adverse employment action even if the new job does cause some modest stress not present in the old position.")

The Court agrees with Defendant and finds that without more, Plaintiff's laconic allegation that this change of position constituted retaliation fails.  The Defendant cites the depositions of various people

### D. Agency Grants Plaintiff's Request to Work From Home

In June 2006, the Agency officially granted Plaintiff's request for a medical accommodation.  The Plaintiff was approved to work from home on Tuesdays and Thursdays -- just as the FOH had recommended.  Plaintiff claims that this action was materially adverse given her medical condition.  (Paper 26 at 15.)

The Court is befuddled by this argument, and quite frankly finds the argument absurd.  While the medical accommodation certainly changed the terms and conditions of Plaintiff's employment, the change was as a result of the Plaintiff's request due to her medical condition.  Thus, Plaintiff's

14

claim that the grant of her request was materially adverse due to her medical condition belies logic.

Plaintiff also contends that there is a "discrepancy between [her doctor's] actual recommendation and the recommendation that Dr. Puryear relayed to [her]," because her Plaintiff's schedule remained 9:30 a.m. to 6:00 p.m. (Paper 26 at 12.) The Court compared this contention with the April 17, 2006 letter written by Dr. Holland, wherein he advised the Agency of Plaintiff's condition and recommended an appropriate accommodation. (Paper 22 Ex. 35) Dr. Holland recommended that Plaintiff "work at home on a part time basis, such as Tuesday[s] and Thursdays, while working in her official worksite on the remaining work days. During these latter shifts she should be allowed maximum flexibility around the office's core hours." *Id*. It has already been established that the Agency's core hours were 6:00 a.m. until 6:30 p.m., and Plaintiff herself testified during her deposition that due to her medical condition, arriving before 9:30 a.m. was very difficult. Thus, in order for Plaintiff to both have "maximum flexibility" during core hours but also complete a full work day, the timeframe of 9:30 a.m. until 6:30 p.m. was the only real option. Therefore the Court does not find any inconsistency or discrepancy between what was recommended by Dr. Holland and what was relayed to Plaintiff by Dr. Puryear.

For these reasons, the Court finds that Plaintiff's claim that this event was retaliatory fails.

**Conclusion**

The Court has read the record thoroughly and while it is clear that Plaintiff suffered from a significant medical condition, Plaintiff's pleadings are sparse and virtually bereft of any objective facts that would allow this Court to conclude that the four events that took place between

15

February and June 2006 were done in retaliation for Plaintiff filing a claim with the EEO. Accordingly, the Court will grant Defendant's Motion for Summary Judgment. A separate Order will follow.

\_\_August 28, 2009_____           _____/S/_____
Date                                           Alexander Williams, Jr.
                                               United States District Judge